IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FAMILY LIFE CHURCH, et al.,      )
                                 )
                Plaintiffs,      )
                                 )
      v.                         )      No.  07 C 217
                                 )
CITY OF ELGIN,                   )
                                 )
                Defendant.       )

MEMORANDUM OPINION AND ORDER

      Family Life Church ("Family Life") charges the City of Elgin

("Elgin") with an array of state and federal statutory and

constitutional violations.  Family Life sought to operate a

homeless shelter in its church in Elgin's city center but ran

into zoning ordinances that require a conditional use permit

("Permit")[1] to operate a homeless shelter in that area--a Permit

that Family Life ultimately obtained.  Family Life challenges

both the Permit requirement as such and its own perceived delays

in having obtained the Permit.  Frank Cherrye ("Cherrye"), a

homeless individual, brings additional related claims against

Elgin.

      Elgin moves for summary judgment under Fed. R. Civ. P.

_____

      [1]  Most often the term "permit" connotes an authorization
issued administratively, while under 65 ILCS 5/11-13-1.1 the
permission required here involves passage of a separate ordinance
by Elgin's City Council.  But the parties' submissions have used
the familiar acronym "CUP" to denote that required permission,
and this opinion will follow their lead by using "Permit" rather
than "Ordinance" (it eschews "CUP" because of an aversion--
perhaps idiosyncratic--to alphabet-soup definitions other than
universally-employed ones such as NLRB, SEC, NAACP and the like).

("Rule") 56.[2]  For the reasons stated in this memorandum opinion

and order, Elgin's motion is well taken and the entire action is

dismissed.

Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the

absence of any genuine issue of material fact (<u>Celotex Corp. v.

Catrett</u>, (477 U.S. 317, 322-23 (1986)).  For that purpose courts

consider the evidentiary record in the light most favorable to

nonmovants and draw all reasonable inferences in their favor

(<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir.

2002)).  But to avoid summary judgment a nonmovant "must produce

more than a scintilla of evidence to support his position" that a

genuine issue of material fact exists (<u>Pugh v. City of Attica</u>,

259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific

facts that demonstrate a genuine issue of triable fact" (<u>id</u>.).

Ultimately summary judgment is warranted only if a reasonable

jury could not return a verdict for the nonmovant (<u>Anderson v.

Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  What follows is

a summary of the facts viewed in the light most favorable to

---

[2]  This is the most recent of several motions by the parties
that have generated written opinions, all but this one having
been issued by this Court's colleague Honorable Marvin Aspen, who
had the case on his calendar from its inception until it was
reassigned to this Court in November 2007.

Family Life and Cherrye.[3]

<u>Background</u>

Family Life is a church that has been operating in the same building in Elgin since July 2005 (E. St. ¶4). In August 2005 Family Life invited H.E.L.P.S., A Ministry of Caring ("HELPS"), to operate a homeless ministry (including a shelter) in its church building, and the shelter began operation on October 1, 2005 (E. St. ¶5; FL Add. St. ¶2-3). HELPS provided volunteers knowledgeable in running a homeless shelter, as well as furnishing mattresses and other necessary materials (FL Add. St. ¶7). Neither Family Life nor HELPS initially sought any sort of additional permit to operate the homeless shelter beyond Family Life's existing permit to operate the church (E. St. ¶6; FL Resp. St. ¶6).

In response to a complaint that HELPS was operating a shelter without proper approval, City Code Enforcement Officer Clyde Larson ("Larson") inspected Family Life's building in October 2005 (E. St. ¶11; FL Resp. St. ¶11; FL Add. St. ¶10-11).

---

[3] Elgin's LR 56.1 Statement of Undisputed Facts will be cited as "E. St. ¶-" and Family Life's responses as "FL Resp. St. ¶--." Family Life's additional factual statements are referred to as "FL Add. St. ¶--," and Elgin's responses to those statements as "E. Add. St. Resp. ¶--." Where the factual assertion in an original statement is unrebutted, only the original will be cited. Finally, citations to Elgin's Memorandum ("Mem."), Family Life's Responsive Memorandum ("Resp.") and Elgin's Reply Memorandum ("R. Mem.") will use the same "E." and "FL" lead-ins.

Larson cited Family Life with three violations, including (1) lack of a Permit to run a shelter and (2) lack of an occupancy permit for the building (E. St. ¶11; FL Resp. St. ¶11; FL Add. St. ¶10-13).

In May 2006 Elgin's Director of Community Development Jerry Deering ("Deering") saw a newspaper article that reported people were living in Family Life's building, and he directed Code Enforcement Officer Vincent Cuchetto ("Cuchetto") to visit the building (E. St. ¶12). Cuchetto did so on May 13 and reported back to Deering the presence of 30 to 40 mattresses and other signs that the building was being used for housing (E. St. ¶13).

Later in May Deering met with HELPS Director Angelo Valdez and advised him that the shelter was operating without proper zoning approval (E. St. ¶15; FL Resp. St. ¶15). In late July Cuchetto wrote Family Life a letter stating that all building and zoning code issues had to be resolved by September 14 to avoid the issuance of a citation and court action (E. St. ¶16).

On September 5 HELPS submitted an application for a Permit to operate the homeless shelter in Family Life's building (E. St. ¶18). That led to a further inspection of the building on September 22, this time by Cuchetto and Elgin Fire Marshal Richard Dunn (E. St. ¶¶21-22). After that inspection Cuchetto cited Family Life with 105 building, fire and life-safety code violations, including 27 imminent life-safety violations. Those

4

violations were relevant to the use of the building both as a place of public assembly and as a shelter (E. St. ¶23; FL St. ¶23). Within a few days after the inspection Deering met with Family Life's Pastor Robert Whitt and gave him a copy of the inspection report (E. St. ¶24). Elgin insisted that the shelter be shut down until the proper permits were obtained, and shelter operations ceased on October 20 (E. St. ¶¶28-29; FL Add. St. ¶22).

On November 1, 2006 the Elgin Zoning and Subdivision Hearing Board ("Zoning Board") held a public hearing on HELPS' Permit application and recommended that the application be approved by the City Council subject to certain conditions (E. St. ¶30). Elgin's Corporation Counsel then took the application for review before it was to be placed on the City Council's agenda (E. St. 32).

On January 11, 2007, with the Permit application still not on the City Council's agenda, HELPS, Family Life and Cherrye filed the Complaint in this action. Judge Charles Norgle (then acting as this District Court's emergency judge) denied plaintiffs' request for a temporary restraining order against Elgin the next day (E. St. ¶33; FL Resp. St. ¶33).

In early February 2007 two local newspapers reported that HELPS was dropping out of the lawsuit and forgoing its efforts to reopen the homeless shelter (E. St. ¶34). Attorneys for Elgin

inquired as to HELPS' intent to proceed with the Permit application, but it was not until almost a month later (on March 1) that HELPS' counsel informed Elgin that it was not withdrawing its Permit application (E. St. ¶35). No inquiry was made as to Family Life's intent to proceed. Over the next couple of months HELPS did take steps to withdraw from the lawsuit, and it formally withdrew on May 9, 2007 (E. St. ¶36). Family Life "took over" HELPS' Permit application when it became clear that HELPS no longer had an interest in pursuing it.[4]

At the April 25, 2007 City Council meeting the Permit application was discussed and received tentative approval. On May 9 the City Council formally granted a Permit to Family Life with the condition that the building, fire and life-safety violations identified in the September 2006 inspection report be cured before reopening the shelter (E. St. ¶39). During a re-inspection the following day Cuchetto found that 40 of the 105 code violations noted earlier still remained unresolved, including 5 imminent fire and life-safety violations (E. St. ¶40; FL Resp. St. ¶40).[5] As of the date of this memorandum opinion and order, no shelter is operating in Family Life's building.

---

[4] Later references to Family Life's Permit application speak of the application originally filed by HELPS.

[5] Family Life contends that all 27 life-safety repairs were completed by February 2007 (FL Resp. 7), but it admits that Cuchetto cited it with the 5 life-safety violations as unremedied in May 2007 (FL Resp. St. ¶40).

By coincidence, Public Action To Deliver Shelter ("PADS") also had a Permit application to operate a homeless shelter pending during the same time frame, and it also received a positive recommendation from the Zoning Board on November 1, 2006 (E. St. ¶44). PADS' Permit application received tentative approval from the City Council on November 29 and formal approval on December 20, 2006 (E. St. ¶45). PADS is a non-religious not-for-profit organization that has a service agreement with Elgin to provide homeless shelter services and has operated in numerous locations in Elgin for years (E. St. ¶¶42-43). PADS receives funding from Elgin in exchange for abiding by the terms of the service agreement (E. St. ¶49).

One provision of its service agreement permits PADS to take in any homeless person, but anyone who cannot demonstrate a connection to Elgin is permitted to stay at PADS for only three days (E. St. ¶50). Cherrye, a homeless man who had previously stayed at the Family Life shelter, went to PADS for shelter in October 2006 (E. St. ¶52). After three days he was required to leave because he did not sufficiently demonstrate a connection to Elgin (E. St. ¶53).

<u>Justiciability Challenges</u>

As an initial matter, Elgin disputes Family Life's standing to sue and the ripeness of its claim. Standing is challenged because the unremedied code violations at Family Life's premises

7

have continued to bar it from reopening the homeless shelter even after its Permit application was granted. Elgin argues that any delay in processing Family Life's Permit application is therefore nonactionable because the shelter could not have opened anyway in the face of the remaining code violations. But that mischaracterizes Family Life's Complaint, which charges in part that it was wrong for Elgin to subject Family Life to the Permit process at all. In addition, Family Life arguably lacked full motivation to fix the code violations until the Permit was granted, so that it could be harmed by a delay in Elgin's processing of its Permit application.

Elgin's second justiciability challenge is that Family Life's claim is not ripe because this lawsuit was brought before the City Council issued a final decision to grant or deny a Permit to Family Life. Because the City Council granted the Permit after this action was filed, that ripeness challenge might well be viewed as moot. But even were that not so, it will be recalled that Family Life claims it was wronged both by being required to obtain a Permit and by the delay in the consideration of its Permit application. Those claims do not require a final decision on the application to have become ripe.[6]

_____

[6] Elgin also argues that Family Life "did not exercise available means under state law to secure a final decision" (E. R. Mem. 7), without elaborating on what more Family Life could have done. In the absence of a more fully developed argument, that contention must be rejected.

## Applicability of the Permit Requirement

Before this opinion moves to specific theories of recovery, Family Life's general contention that Elgin improperly forced it through the Permit process should be addressed.[7] Family Life's building is located in the CC2 center city district. Churches are permitted in that district only as conditional uses, as are homeless shelters (classified as "individual and family social services")(Elgin Code §19.35.730(B)(5)). Elgin's City Council has the authority to pass an ordinance granting a conditional use, but conditional uses are not otherwise permitted (Elgin Code §19.65.020). Specific standards for the approval of a conditional use, as well as the procedures for applying for a Permit and for holding a public hearing considering the application, are spelled out in the zoning code (Elgin Code §§19.65.030, 19.65.050, 19.65.060). No limit is set, however, for the time frame within which the City Council must vote on a Permit application.

After holding a public hearing, the Zoning Board must make a recommendation to the City Council regarding the application (Elgin Code §19.65.070(A)). In turn the City Council is free to impose conditions and restrictions on the grant of a Permit

---

[7] Contrary to Elgin's assertion that Family Life raises that contention for the first time in its response to the motion for summary judgment (E. R. Mem. 2), it clearly appears in Amended Complaint ("AC") ¶¶38, 45, 52, 66, 79, 82, 86 and 108-10.

(Elgin Code §19.65.070(B)(1)).

Under the Elgin Zoning Code an "accessory use" is one that is subordinate in purpose to the principal use and that is "customary and traditionally incidental to the principal use served, which[8] is operated and maintained under the same single ownership or unified control as the principal use served, and which is located on the same 'zoning lot'" as the principal use (Elgin Code §19.90.015). For a use to be "accessory," it must be established later than or at the same time as the principal use and must occupy less than 10% of the zoning lot area and less than 10% of the building floor area (id.). Family Life contends that the homeless shelter was an accessory use[9] to its church, so that no additional Permit was required for the shelter to operate (FL Resp. 1-2).

Although Elgin has set out a more comprehensive (and more persuasive) argument detailing why its zoning ordinance should not be read as conferring "accessory use" status on the homeless shelter at Family Life, this Court can decide the issue on much

_____

[8] [Footnote by this Court] As the text quotation reflects, the Zoning Code's authors are not adherents to Fowler's <u>Modern English Usage</u> in its differentiation between "which" (used to introduce a descriptive clause) and "that" (used to introduce a restrictive clause), so the quotation is nonparallel in its construction.

[9] Family Life neglects to present any information on what percentage of the building (or lot area for that matter) was dedicated to the homeless shelter.

simpler grounds. Accessory uses to conditional uses (and there is no dispute that the church is itself a conditional use) are themselves also conditional uses (Elgin Code §19.35.730(B)(10)) and therefore <u>require</u> a Permit (Elgin Code §§19.65.010 et seq.). That cuts off at the pass all of Family Life's arguments accusing Elgin of improperly forcing the Permit process upon it (though the separate issue as to whether the Permit process is overly burdensome on Family Life's religious exercise will be addressed later).

Because Elgin's zoning ordinances required Family Life to secure a Permit to operate a homeless ministry at its church in the CC2 district, two of Family Life's claims--Count VII labeled "Compliance with the EZO" and Count VIII labeled "Accessory Use Under the EZO"--are dismissed.[10] Those theories of recovery hinge solely on the false contention that under Elgin's ordinances Family Life did not need a Permit to operate a homeless shelter.

<u>                    Substantial Burden on Religious Exercise</u>

Providing shelter to the homeless is an essential religious exercise to the members of Family Life (AC ¶36). Family Life has

_____

[10] Because the parties, like nearly all federal practitioners in this judicial district, have followed the conceptually flawed practice of carving up a single claim (which is the relevant federal term, see <u>NAACP v. Am. Family Mut. Ins. Co.</u>, 978 F.2d 287, 291-93 (7th Cir. 1992)) into several counts that reflect different theories of recovery, this opinion follows their lead.

challenged the necessity of going through the Permit application

process and the delays associated with its application under both

the First Amendment's Free Exercise Clause and the "substantial

burden" provision of the federal Religious Land Use and

Institutionalized Persons Act ("Act," 42 U.S.C. §2000cc(a)(1)).[11]

Here is Section 2000cc(a)(1):

(a) Substantial burdens

(1) General Rule

> No government shall impose or implement a land use
> regulation in a manner that imposes a substantial
> burden on the religious exercise of a person,
> including a religious assembly or institution,
> unless the government demonstrates that imposition
> of the burden on that person, assembly, or
> institution--

>> (A) is in furtherance of a compelling
>> governmental interest; and

>> (B) is the least restrictive means of
>> furthering that compelling governmental
>> interest.

Free Exercise Clause analysis begins with an inquiry into

whether the law at issue is neutral and generally applicable

(Vision Church, United Methodist v. Vill. of Long Grove, 468 F.3d

975, 996 (7th Cir. 2006)).  If it is not, strict scrutiny applies

and the law must be narrowly tailored to further a compelling

governmental interest (id.).  Even if the law is facially

neutral, if it unduly burdens the free exercise of religion it

---

[11]  Further citations to the Act will take the form
"Section --," omitting the prefatory "42 U.S.C."

must still be justified by a compelling governmental interest
(id.).  As can be seen from the above-quoted statutory text, a
land use regulation that substantially burdens religious exercise
is also subjected to strict scrutiny under the Act, which
codifies some of the protections afforded by the Free Exercise
Clause (id.).

Elgin's ordinance requiring a Permit to operate a homeless
shelter in the CC2 district is facially neutral:  It applies to
both religious-based and non-religious-based shelters.  PADS, a
non-religious homeless shelter operation, was required to go
through the same application process as Family Life and HELPS
were (although PADS' application was approved more rapidly).
Many other types of land uses (including billiard parlors, child
daycare centers and food stores) require the same permit to
operate in the same part of Elgin (Elgin Code §19.35.730(B)).
With that, and with the similarity of the analysis called for
under the Free Exercise Clause and Section 2000cc(a)(1),
consideration of those two sources can be collapsed into a single
analysis[12] (Vision Church, 468 F.3d at 996).

Here is what Civil Liberties for Urban Believers v. City of
Chicago, 342 F.3d 752, 761 (7th Cir. 2003) has said as to the

---

[12]  Family Life does plead another basis for recovery under
Section 2000cc(a)(1)--the burden of assertedly being able to
operate its shelter only during the months from October through
April.  As discussed below, nothing so restricts the operation of
the shelter.

Act's "substantial burden" provision (undefined by the statute):

> [A] land-use regulation that imposes a substantial
> burden on religious exercise is one that necessarily
> bears direct, primary, and fundamental responsibility
> for rendering religious exercise--including the use of
> real property for the purpose thereof within the
> regulated jurisdiction generally--effectively
> impracticable.

For First Amendment purposes a substantial burden exists "when the government [has] put substantial pressure on an adherent to modify his behavior and to violate his beliefs" (Vision Church, 468 F.3d at 997). Even if detrimental to religious exercise, a merely incidental effect of a neutral and generally applicable regulation need not be justified in strict scrutiny terms (id. at 998).

Here the harm to Family Life's religious exercise was no more than incidental to Elgin's neutral land use ordinances. Elgin legitimately seeks to control what types of operations populate its city center. No evidence exists that it seeks to exclude religious organizations (either generally or Family Life in particular) because of their nature. Instead it simply seeks oversight of the existence and operation of homeless shelters as such.

Family Life attempts to invoke Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895 (7th Cir. 2005) for the proposition that "delay, uncertainty, and expense" as to whether a religious land use is legal are

14

sufficient to constitute a substantial burden (FL Resp. 11).  In that case the application for rezoning (required to permit the construction of a church) had been wrongfully denied by the city, leaving the congregation with the prospect of either purchasing another parcel of land and attempting another navigation through the rezoning process or filing more applications with the city using the already-owned land (Sts. Constantine & Helen, 396 F.3d at 901).  That level of delay, uncertainty and expense--given that the city's basis for denying the rezoning request was "utterly groundless" (Petra Presbyterian Church v. Vill. of Northbrook, 489 F.3d 846, 851 (7th Cir. 2007))--rose to the level of substantial burden.

But that does not of course mean that all delays, uncertainties and expenses are substantially burdensome.[13]  While surely inconvenient for Family Life, the eight-month application process it encountered  does not rise to the level of a substantial burden.[14]  As stated earlier, HELPS submitted the

_____

[13]  Otherwise "substantial" would be taken out of "substantial burden"--something that courts must be mindful not to do (Petra Presbyterian Church, 489 F.3d at 851).

[14]  FL Resp. 11 urges that the filing of this lawsuit on January 11, 2006 should be included in the calculation of its burden.  Nothing in the record even suggests, however, that it would have taken longer (much less substantially longer) to obtain a Permit had it not been for the initiation of this litigation.  FL Resp. 11 also seeks to inject a comparison to PADS' application in the "substantial burden" analysis.  But as explained in Sts. Constantine & Helen, 396 F.3d at 900, the Act's substantial burden analysis is not an exercise in

15

Permit application on September 5, 2006, it was recommended for approval by the Zoning Board on November 1 and was then formally approved by the City Council on May 9, 2007 (E. St. ¶¶18, 30, 39). But simply reciting that timeline does not do the job for Family Life.

Much of the burden on Family Life was self-imposed by its premature opening of the shelter before seeking a Permit and its then having to close down the shelter during the pendency of the Permit application. Homeless shelters cannot be created overnight, and the cogs of local land use approval require time to turn. Any burden on religious exercise felt by Family Life in the eight months that its application was pending was only incidental to Elgin's legitimate interests in maintaining orderly municipal development. Because Elgin's zoning ordinances are facially neutral and generally applicable and because they have not saddled Family Life with a substantial burden, neither the Free Exercise Clause nor §2000cc(a)(1) is implicated, and those aspects of the Complaint are also dismissed.[15]

_____

comparison--that is the province of the Act's equal terms provision, discussed later.

[15] Family Life's Free Speech Clause claim, given short shrift in the parties' submissions, fails as well. Family Life was free to minister to the homeless in all respects other than providing shelter with or without a Permit. Lacking a Permit to operate a homeless shelter did not prevent Family Life from expressing ideas or sharing its religious philosophies with the homeless. Merely providing a place for the homeless to sleep is not communicative activity protected by the Free Speech Clause

In general terms the Fourteenth Amendment's Equal Protection Clause requires that, absent a good reason, similarly situated persons should be treated similarly (Plyler v. Doe, 457 U.S. 202, 216 (1982)). When classifications are made by race, alienage or national origin, or when government interferes with certain fundamental rights such as freedom of speech or religion, the "good reason" standard must rise to the level of a compelling state interest and the governmental action must be narrowly tailored to facilitate that interest (Vision Church, 468 F.3d at 1000; St. John's United Church of Christ v. City of Chicago, 502 F.3d 616, 637 (7th Cir. 2007)). Where none of those suspect classes or fundamental rights is involved, however, governmental action is presumptively valid and will be sustained if it is rationally related to a legitimate state interest (St. John's, id. at 637-38).

FL Resp. 13 confirms that Family Life's equal protection claim is based on Elgin's asserted interference with its fundamental right to freedom of religion, rather than on any claim of Elgin treating Family Life differently from PADS (FL Resp. 13). Family Life contends that Elgin impeded its fundamental right to run a homeless ministry based on Christian

---

(cf. United States v. O'Brien, 391 U.S. 367, 376 (1968)). That aspect of the case is likewise dismissed.

principles that included Bible studies, worship and other religious activities (id.).  But that "fundamental right" claim is no more than a repackaging of Family Life's Free Exercise Clause challenge.  And where (as here) a plaintiff's Free Exercise Clause claim fails, the rejection of a comparable equal protection claim based on the same facts need pass only the rational basis test (St. John's United Church, 502 F.3d at 638).

Elgin certainly had legitimate reasons for spending extra time on Family Life's Permit application:  Both the numerous unrectified code violations and Family Life's previous operation of the shelter without the necessary Permit or occupancy permit. This Court does not sit as a critical oversight reviewer of Elgin's decisionmaking process, given the absence of evidence that it discriminated against Family Life on the basis of religion.  Elgin's Permit process, and its handling of Family Life's Permit application in particular, plainly survive rational basis scrutiny.  Hence Family Life's equal protection claim based on its fundamental right to exercise its religion freely is doomed as well.

<u>Disparate Treatment</u>

Family Life also charges Elgin with treating it differently from PADS, a non-religious organization, in violation of the Act's "equal terms" provision (Section 2000cc(b)):

(b) Discrimination and exclusion

(1) Equal terms

No government shall impose or implement a land use
regulation in a manner that treats a religious
assembly or institution on less than equal terms
with a nonreligious assembly or institution.

(2) Nondiscrimination

No government shall impose or implement a land use
regulation that discriminates against any assembly
or institution on the basis of religion or
religious denomination.

In that respect Family Life cries "foul!" based on perceived
disparities between the treatment of the two organizations'
Permit applications (AC ¶60). Both applications were recommended
for approval by the Zoning Board on November 1, 2006, but PADS'
application was formally approved on December 20, 2006 while
Family Life waited until May 9, 2007 to receive the same approval
(E. St. ¶¶30, 39, 44-45).[16]

Vision Church, 466 F.3d at 1003 recognizes three types of
equal-terms violations. Among those, the parties agree, Family
Life's Complaint seeks to call into play the category of "a truly
neutral statute that is selectively enforced against religious,
as opposed to nonreligious assemblies or institutions" (id.). On
that score it is important to remember that different treatment
is not inherently treatment that is impermissibly unequal

---

[16] Although this opinion draws reasonable inferences in
Family Life's favor for present purposes, it should be noted that
it is difficult to draw meaningful comparisons without also
knowing when PADS filed its Permit application.

(<u>Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County</u>, 450 F.3d 1295, 1313 (11th Cir. 2006)).

Elgin cites numerous differences to justify the disparate timing accorded the two applications (E. Mem. 11-12; E. R. Mem. 13):

> 1.  PADS did not begin operating its homeless shelter until its Permit was approved, while Family Life operated its homeless shelter without a necessary Permit for over a year.
>
> 2.  PADS' building had no outstanding code violations at the time of its Permit application, while Family Life's building contained numerous building, fire and life-safety violations.
>
> 3.  PADS worked cooperatively with Elgin for years in preparing its application and had submitted detailed plans for its homeless shelter, while Family Life never presented Elgin with a plan for rectifying its building's code violations and never demonstrated that it had resolved those violations.

Family Life, on the other hand, claims that those proffered differences are illusory and that its application moved more slowly through the system because of Elgin's animosity toward its religious affiliation (FL Resp. 14).

That accusation, however, is unwarranted by the record

evidence.  Although Family Life alleges in its statement of additional facts that Elgin's hostility toward it stemmed from its religious affiliation, its citation to the record (FL Add. St. ¶34) does not support that.  Family Life's own Rule 30(b)(6) witness, its Pastor Whitt, was totally unable to articulate a belief that Elgin acted discriminatorily on the basis of religion.[17]  Even at the summary judgment stage, with the required inferences drawn in its favor, Family Life must provide some support for the inference that the different treatment was based on religion.  It has not.

To be sure, Family Life's Permit application did move more slowly through the system than PADS' application, but nothing creates a reasonable inference that such was the case because of Family Life's status as a religious organization.  Instead Elgin has pointed to numerous legitimate differences between Family Life and PADS that support different treatment.  Absent any evidentiary support, the proposed inference is not reasonable and Family Life's disparate treatment claim also fails.

---

[17]  When asked in his deposition whether he believed that PADS was treated differently from HELPS and Family Life because of religion, Pastor Whitt had this to say at the end of several futile stabs at the subject (FL St. Ex. 12 at 70-71):

See, I don't know how to--I don't know--I don't know how to answer that question.  I'm being real honest.  I really don't.

Family Life also contends that Elgin has violated the Act's Section 2000cc(b)(3)(B) prohibition that bars a government from imposing or implementing a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." Family Life complains that Elgin Code §6.67.030, which confines the operation of "temporary overnight shelters" to the months of October through April and to the hours from 6 p.m. through 8 a.m. unreasonably limits its ability to practice its religion (AC ¶¶26, 74-76).

That argument does not withstand analysis, because Family Life received a Permit authorizing it to operate an "emergency shelter," not a temporary overnight shelter. Elgin's ordinances were amended on June 14, 2007 to define "emergency shelter" (Elgin Code §19.90.015, as amended by Ordinance No. G33-07):[18]

> "Emergency Shelter" means a short-term residential facility providing lodging and meals for no more than twelve (12) hours per day to homeless persons who provide positive identification pending attempts by such residents to find more permanent housing. Such shelters shall be adequately staffed during operating hours with minimal supportive services including mental health, housing, healthcare, recovery and education, and where no meals or other services are provided to non-residents of the shelter.

---

[18] That amendment (which, though in force, has yet to be incorporated into Elgin's published codification) seems to have slipped under the radar of both parties: Both say mistakenly that "emergency shelter" is not defined by ordinance (FL Add. St. ¶4; E. Add. St. Resp. ¶4).

22

Emergency shelters may operate year-round.

Although that definition did not become part of Elgin's ordinances until a little over a month after Family Life was granted its Permit, Family Life was not operating a shelter at that time. And before issuance of the Permit, Family Life's shelter was operating without a valid Permit in any event.[19]

Limiting homeless persons to stay at the emergency shelter for no more than 12 hours per day does not unreasonably limit Family Life's religious assembly or institution: Family Life can run an effective homeless ministry within the confines of the 12 hour per day limitation. And the ordinance is reasonable because it permits the homeless to receive overnight shelter while furthering the city's goal of encouraging the homeless to obtain independent residences. Because Family Life suffered no past unreasonable limitation and because Family Life faces no prospect of future unreasonable limitation, this aspect of the lawsuit also calls for dismissal.

<u>Frank Cherrye Equal Protection</u>

Finally in terms of federal law, this opinion turns to Cherrye's individual claim. One of his two asserted bases for bringing suit against Elgin is that the agreement between Elgin and PADS prohibiting homeless persons from staying at PADS'

---

[19] Furthermore, no evidence has been presented that the October-April limitation was ever enforced, or sought to be enforced, against the Family Life shelter.

shelter for more than three days unless they can demonstrate a connection with the city[20] violates his fundamental right to travel and migrate. When this action began before Judge Aspen, Cherrye moved for summary judgment. Judge Aspen's memorandum opinion and order denying that motion (Dkt. 79) stated that the connection-to-Elgin requirement is a bona fide residence requirement that passes rational basis review because Elgin has a legitimate interest in ensuring that the funds it provides to PADS are largely used to provide shelter to locals.

Under long-established caselaw in this area, only residence requirements that involve a durational component have been found to impose an unconstitutional infringement on the right to travel, calling for the application of strict scrutiny analysis (<u>Andre v. Board of Trustees of the Vill. of Maywood</u>, 561 F.2d 48, 52 (7th Cir. 1977)). Because PADS' restriction on the length of time that persons unaffiliated with Elgin may stay at its shelter involves no durational requirement, the rational basis test applies. This Court seconds both Judge Aspen's analysis on that score and his application of the rational basis test. Cherrye has offered no response in opposition to Elgin's motion--but even

---

[20]    To demonstrate a sufficient connection with Elgin, a person wishing to stay at the shelter must show one or more of four alternatives:  (1) a mailing address in Elgin within the past two years, (2) established employment in Elgin, (3) residence of his or her immediate family at a mailing address in Elgin or (4) current school attendance in Elgin by the person or his or her child (E. St. ¶51).

if he had, the result would have been the same:  Cherrye loses.

<u>State Law Claims</u>

At last this opinion reaches the two remaining state law claims:[21]  Family Life's claim under the Illinois Religious Freedom Restoration Act ("Illinois Act") and Cherrye's claim for intentional and negligent infliction of emotional distress.  Both those claims seek redress for harms created by (1) Elgin requiring Family Life to obtain a Permit to operate the shelter and (2) the delay in the issuance of the Permit to Family Life.[22]

In ruling on Elgin's earlier motion to dismiss, Judge Aspen held that the Illinois Tort Immunity Act did not call for the dismissal of the state law claims at that point because the claims were based on the asserted wrongfulness of requiring Family Life to secure a Permit in the first place.  With that contention now dispatched, and with the facts more fully developed, the Tort Immunity Act can properly be applied to the delay facet of the state law claims.  In relevant part that statute reads (745 ILCS 10/2-104):

A local public entity is not liable for an injury

---

[21]  Counts VII and VIII have already been dismissed in this opinion, and Count XII was earlier dismissed at page 13 of Judge Aspen's September 24, 2007 memorandum opinion and order (Dkt. 81).

[22]  Family Life also complains in its Illinois Act claim that Elgin's limitation of the homeless ministry to the months of October through April creates an improper burden--but, as already discussed, the shelter is not so limited.

caused by the issuance, denial, suspension or
revocation of, or by the failure or refusal to issue,
deny, suspend or revoke, any permit, license,
certificate, approval, order or similar authorization
where the entity or its employee is authorized by
enactment to determine whether or not such
authorization should be issued, denied, suspended or
revoked.

As a municipal corporation (E. St. ¶2), Elgin is of course a

"local public entity" (see 745 ILCS 10/1-206), and the harm that

it asserts fits the expansive statutory definition of "injury"

(745 ILCS 10/1-204). And of course Family Life's Permit is a

"permit." Under the statutory framework, the outright issuance

or denial of a permit is insulated from legal consequences--and

because the greater obviously includes the lesser, the

complained-of delay followed by issuance of the Permit is a

fortiori immune under the Tort Immunity Act as well.[23]

There is, however, a question whether the Tort Immunity Act

should bar a claim against a municipal corporation brought under

the later-enacted Illinois Act, in light of this provision in the

latter enactment (775 ILCS 35/25(a)):

This Act applies to all State and local (including home
rule unit) laws, ordinances, policies, procedures,
practices, and governmental actions and their
implementation, whether statutory or otherwise and
whether adopted before or after the effective date of

---

[23] In the context addressed by Judge Aspen, he
distinguished Vill. of Bloomingdale v. CDS Enters., Inc., 196
Ill.2d 484, 752 N.E.2d 1090, 1098-1101 (2001) on the ground
stated in the immediately preceding paragraph of the text. But
now Vill. of Bloomingdale strongly supports the conclusion
announced here.

this Act.

Whether that provision does or does not trump the Tort Immunity Act has yet to be decided by the Illinois courts (and has not been discussed by the parties), and we are regularly reminded by our Court of Appeals that it is not this Court's province to decide novel questions of state law. But no matter. Family Life's state law claim is a loser on the merits for the same reason that its Free Exercise and Section 2000cc(a)(1) claims have failed: Elgin did not substantially burden Family Life's religious exercise, as is required to state a claim under the Illinois Act (775 ILCS 35/15).

Lastly, statutory immunity undeniably extends to Cherrye's allegations of infliction of emotional distress stemming from the delay in processing the Permit application. So all remaining state law claims in the AC are dead in the water as well.

<u>Conclusion</u>

This extended excursion through plaintiffs' exhaustive (and exhausting) list of allegations against Elgin has shown that no genuine issues of material fact exist and that all of plaintiffs' claims are flawed in legal terms. Judgment is therefore ordered to be entered in Elgin's favor as a matter of law. This action is dismissed in its entirety.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 18, 2008

27